Mr. Chief Justice Shepard
delivered the opinion of the ‘Court:
This is an interference proceeding involving priority of invention of an improvement in mechanism for forming sheet metal elbows, having circumferential overlapped crimps and cross-sectional pattern other than cylindrical. The invention involved is limited to a mechanism adapted to produce the above-described elbows in one operation, because machines for producing corrugated elbows of cylindrical cross section were in use producing the same commercially. The plain round elbows were made by one machine and corrugated by the other. Ferdinand Dieekmann, the father of Adolph, the appellant, had for many years been engaged in the manufacture of such elbows under patents, and, in 1902 and 1903, his trade represented about 75 per cent of the total elbow sales in the United States.
Adolph Dieekmann filed his application January 18, 1906. In his preliminary statement, he alleges conception of the invention of the issue February 1, 1892, disclosure in the same .month, and reduction to practice in September 1894.
Frederick Bruñe filed January 31, 1906, and alleges conception March 31, 1903, drawing and disclosure on the same date, and reduction to practice in July, 1903. Bruñe is the manager •of the machine shop and elbow department of the Milwaukee *401 Corrugating Company, by which elbows are manufactured with his machine.
The issue contains eighteen counts, the first eleven of which were in Brune’s application and suggested to Dieckmann; the last seven were taken from Dieckmann’s application and suggested to Bruñe. It is considered that counts 1, 4, 7, 11, and 18 are fairly representative, and it is unnecessary to copy the ■entire eighteen. The aforesaid counts read as follows:
1. In a machine for making sheet metal pipe elbows, the combination of a corrugated stationary die; a correspondingly corrugated swinging die; radially movable bulging dies; means •for projecting said bulging dies outwardly between the stationary and swinging dies when they are separated; dies surrounding the stationary and swinging dies, and fitting the corrugations therein; the dies surrounding the swinging die being movable radially towards and from the same, and capable of swinging therewith towards and from the stationary die; means for moving the dies surrounding the swinging die radially, and means for moving the swinging die with the associated surrounding dies towards the stationary die when the bulging dies .are withdrawn inward, substantially as described.
4. In a machine for making corrugated elbows, the combination of means for progressively forming longitudinal corrugations in a pipe section; means for successively pressing transverse bulges at intervals in one side of the corrugated part of •the pipe; and means for closing' said bulges and curving the pipe into elbow shape, substantially as described.
7. In a machine for making corrugated elbows, the combination of corrugating heads or dies arranged one within the ■other; means for feeding a pipe section step by step between said heads; a pivoted head movable towards and from the corrugating heads, and provided with radially movable jaws; a •clamping die pivoted to the inner corrugating head with the opening of the pivoted head, jaws, and die; radially movable bulging dies, and means for intermittently moving said pivoted head; connections for operating said pivoted head, jaws, and ■die; radially movable bulging dies, and means for intermittent *402 ly moving said bulging dies outwardly between and beyond the clamping die and inner corrugating head, substantially as described.
11. In a machine for making corrugated elbows, the combination of a mandrel terminating at its free and in a corrugating die; a stationary head surrounding said die, and provided with radially movable corrugating dies; means for moving the outer dies towards and from the inner fixed die; means for feeding a pipe on said mandrel step by step between said corrugating dies; a wedge-shaped clamping die pivoted on the thicker side to the fixed corrugating die, and having its curved face correspondingly corrugated; a pivoted head arranged to swing towards and from said stationary head, and provided with j aws movable radially towards and from said clamping die, and having correspondingly shaped faces opposite thereto; means for intermittingly swinging said clamping die and pivoted head towards and from the corrugating dies; radially movable bulging dies of gradually diminshing thickness from the narrower towards the thicker side of the clamping die; and means for intermittently projecting said bulging dies between the clamping die and fixed corrugating die, the opposite ends of the movable corrugating dies of the clamping jaws adjacent to the bulging dies being beveled or inclined outwardly towards the stationary, corrugating head, substantially as described.
18. In a mechanism of the character indicated, a mandrel, a crimp former at the free end of said mandrel, a series of feet movable in a radial direction to and from said mandrel to clamp the blank thereto, a detachable secondary movable mandrel located on the opposite side of said crimp former, the exterior of said secondary mandrel being the same that is to be imparted to the elbow, and a series of feet movable in a radial direction to and from said secondary mandrel to lay down the crimps and shape the crimped portion of the elbow to the pattern of said secondary mandrel.
The tribunals of the Patent Office concurred in awarding priority to Bruñe, and Dieckmann has appealed from the final decision of the Commissioner.
*403 Dieckmann attempted to prove conception as alleged, and the construction of a machine completed in September, 1894, also reduction to practice by producing a few elboivs thereon conforming to the requirements of the issue. The machine was not afterwards put in use, was dismantled, and most of its parts lost or destroyed. He also introduced evidence tending to show the construction of a machine in 1901, upon which elbows of the required kind were made. This was not put in use beyond making a sample elbow.
The Examiner of Interferences held that the machine of 1893-1894 evidently did not corrugate the elbows as required in the first eleven counts, and that the machine of 1901 was not a success. He accorded conception of the issue to Dieekmann in 1893 and 1901, but held that his machines were abandoned experiments, and not reductions to practice. Eor reduction to practice, he limited him to the filing date of his application. The Examiners in Chief and the Commissioner, in succession, substantially agreed with these conclusions. All-concurred in holding that Bruñe conceived the invention of the-issue in the spring of 1903 and completed a machine in July,. 1903, which was later put in use by the Milwaukee Corrugating; Company in the manufacture of elbows. Bruñe made some slight improvement in this machine to strengthen it, and later made several other machines of the same kind, but adapted', to make elbows of different diameter. These contained no improvement in the invention.
We see no reason to question the conclusions of the Patent" Office tribunals in respect of the facts of conception by the-parties respectively. Nor do we see any occasion to differ with-them in respect of the conclusion that Dieckmann’s evidence is; insufficient to show reduction to practice in 1894 or 1901, or-that his delay cannot be excused by the condition of his health;, or' want of means or opportunity, during the long period that’ elapsed between his conception and experiments, and the date-of filing his application.
Assuming then that Dieckmann was the first to conceive the invention, but that Bruñe also conceived it in July, 1903„andJ *404 then built a machine which was used in the manufacture of elbows, it becomes necessary to consider the evidence relating to B rime’s concealment of the invention from the public.
The Commissioner says in his decision: “It appears from the testimony of Bruñe and Kuehn, who was president of the Milwaukee Corrugating Company, that these machines were •concealed from the public practically up to the time that Brune’s application was filed.” We concur in this conclusion. The testimony of Bruñe, Kuehn, and Heisterkamp shows that the machines were kept in a locked room. No one but the inventor, the officers of the company, and the few employees who operated the machine, had access to the room, or were permitted to see the machines.
The company was not a manufacturer of machines for sale, but a manufacturer of elbows, and it was not its purpose, as apparent owner of the invention, or that of the inventor, to make machines for sale to the trade. The elbows manufactured and sold to the trade did not make the invention public. Whether made by one or more machines, or what the character of the machine was, could only be the subject of conjecture. That the public may receive some benefit from the sale of the product of a machine is not the benefit to the public contemplated by the patent laws of the United States. Kendall v. Winsor, 21 How. 322-327, 16 L. ed. 165-167. If an inventor can successfully conceal his device or process from the public, he may prolong Ms monopoly beyond the period secured by a patent. It appears, we think, from the evidence given on behalf of Bruñe, that his application for the patent was stimulated by the fact that another manufacturer was attempting to discover his secret, and had in part succeeded. It appears that on one occasion the key of the machine room had been left in the office •of one of the officers on Saturday night, and could not be found on Monday morning. This occurred sometime in 1904. A new lock was immediately put on the door. The early drawings of the machine were destroyed, as Kuehn testified, “for fear someone would get hold of the drawings, and build a machine similar to it.” He added also: “We did not want any *405 one employéd by us to see the machine, as we expected to have same patented later on.” We find nothing else in the evidence indicating the intention to patent the machine, and the circumstances tend to negative such an intention. Bartle, an employee, who had knowledge of the machine, testified that he was approached by a party in the fall of 1906 (probably should he 1905), who offered him $100 to go to Canton, Ohio, and work for the Berger Manufacturing Company, to see what he could do with a machine it had constructed. This company, it appears, was the party seeking knowledge of the machine in 1905. Heisterkamp, the engineer of the Corrugating Company, testified that in November or December of 1905, a person representing himself to be the agent of the Berger .Manufacturing Company, of Canton, Ohio, came to his engine room and offered him $50 to let the master mechanic of the Berger Company into the room where the machines were, for ten minutes, either day or night. He said the Berger Company had a machine complete with the exception of one point, which interfered with making the elbow. This point they wanted to see on Brune’s machine. He reported this occurrence to the secretary of the company. President Kuehn testified that in December, 1905, he discovered that someone had make a tracing of the later drawings of Bruñe. They must have been taken from the vault where they were kept, by someone “familiar around our office. “The originals were found in the vault when we looked for them. This occurred in December, 1905. When we got wind of someone building machines like ours, we employed detectives, and in that manner obtained the set of drawings that were copied from our original drawings.” He said also: “We were informed that the Berger Manufacturing Company, of Canton, Ohio, was building machines like ours.” “It seems that the Berger Manufacturing Company built this machine according to our drawings, but were unable to finish same, and made an attempt to see our machines by the man that built theirs. They went so far as to offer our engineer money to let their mechanic get into our factory and see our machines,—our corrugated elbow machines. They also offered *406 George Bartle, who was operating the elbow, machine, big money to come to Canton in their employ for a few weeks, to give them all the knowledge he had about our elbow machines.”
The evidence shows that Dieckmann had no connection with any scheme to obtain knowledge of the construction of Brune’s machine. He only knew what the trade knew, namely that the Milwaukee Corrugating Company was manufacturing a noncylindrieal, corrugated elbow. Briefly stated, the evidence establishes the following facts: Dieckmann was the first to conceive the invention of the issue, but failed to reduce it to practice with the necessary diligence. He was the first to file ,an allowable application, which constituted constructive reduction to practice. Bruñe conceived the invention in the spring of 1903, and followed it up with the construction and test of a machine in July, 1903. He carefully concealed the machine from that time until the filing of his application, not only from the public, but from all of the employees of the operating company, save the few necessarily engaged in its operation. He contemplated securing the benefit of his invention through secrecy, instead of through the Patent Office. Learning that the Berger Company had surreptitiously obtained a copy of his drawings, and was attempting to corrupt his employees in order to obtain an inspection of the concealed machine, and remove a difficulty encountered in building a machine from the drawings, and fearing it would finally succeed in successfully copying his machine, he filed his application for a patent.
On these facts, the question arises: Did Dieckmann, the first to conceive and to make application, lose his right to the patent by reason of his intervening delay, to Bruñe, who had a later, but independent, conception, reduced it privately to practice, and deliberately concealed it from the public for about two years and a half? As we have had occasion to say heretofore, “the particular object of the beneficence of the patent law is the individual who first conceives, and with diligence perfects, an invention. And where one has completed the act of invention, his right to the reward in the form of a patent becomes complete, save in two instances that may be satísfac *407 torily shown to exist. First, he loses the right as against the public in general, by a public use for the statutory period. Second, by deliberate concealment or suppression of the knowledge of his invention, he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and bona fide inventor, who, during the period of inaction and concealment, shall have given the benefit of the discovery to the public. Viewed in the light of the ‘true policy and ends of the patent laws,7 the latter is the first to invent, and therefore entitled to the reward.” Thomson v. Weston, 19 App. D. C. 373-380.
“The true policy and ends of the patent laws,” it has been declared by the Supreme Court of the United States, “are disclosed in that article of the Constitution, the source of all these laws, viz., ‘to promote the progress of science and the useful arts,7 contemplating and necessarily implying their extension and increasing adaptation to the uses of society. * * * By correct induction from these truths, it follows that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts; and with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited nor intended to benefit. Hence, if, during such a concealment, an invention similar to or identical with his own should be made and patented, or brought into use without a patent, the latter could not be inhibited nor restricted, upon proof of its identity with a machine previously invented and withheld and concealed by the inventor from the public. The rights and interests, whether of the public or of individuals, can never be made to yield to schemes of selfishness or cupidity.” Kendall v. Winsor, 21 How. 322-328, 16 L. ed. 165-167.
The principle of that decision has been applied by this court in many cases, varying in their respective facts. Mason v. *408 Hepburn, 13 App. D. C. 86; Warner v. Smith, 13 App D. C, 111. Re Mower, 15 App. D. C. 144; Matthes v. Burt, 24 App, D. C. 265; Bliss v. McElroy, 29 App. D. C. 120; Gordon v. Wentworth, 31 App. D. C. 150; Howard v. Bowes, 31 App. D. C. 619.
In Mason v. Hepburn, Mason had reduced the invention to practice and concealed it for seven years, and was held to have lost his right to Hepburn, who obtained a patent some few months before Mason made application. In Warner v. Smith, Warner, who first conceived the invention and made a button,, which, had it been promptly utilized, would have constituted reduction to practice, concealed it for three years and nine months. Priority-was awarded to Smith, who was the last to conceive, but first to apply for patent. He was not a patentee, but an applicant merely. In Re Mower, the applicant lost his right to an opponent, who, during the concealment of his invention, conceived it and obtained a patent. In Matthes v. Burt, Matthes made the mold of the invention in June, 1899; and made several dozen pool balls upon it. He then laid it aside, and, hearing of Burt’s invention of a similar machine, applied for a patent February 19, 1902. He lost to Burt, who entered the office about two months earlier. In Bliss v. McElroy, Bliss constructed and tested his machine in June, 1891, and concealed it. In 1901 McElroy filed an application upon which a patent issued in 1903. Bliss filed thereafter. Priority was awarded to McElroy. In Gordon v. Wentworth, Gordon suppressed knowledge of his machine for more than two years, during which period Wentworth, to whom priority was awarded, made the same invention and applied for a patent. In Howard v. Bowes, the contest was between applicants. Howard, the first to conceive and make a device, secreted the invention for more than a year thereafter, and made application only when informed of Bowes’s reduction to practice and sale of the device.
Applying the principle governing the cases cited, to the facts of this case, we are of the opinion that priority should have been awarded to Dieckmann, who was the first to conceive, and, not *409 withstanding his long inaction, the first to bring the invention before the public by making application for the patent. Had Bruñe, during Dieckmann’s inaction, brought the machines before the public, or filed his application for patent, he would clearly have been entitled to the award. On the other hand, Dieckmann had the right to awake from his long slumber, and when he did so, and filed his application, he became entitled to-the benefit of his earlier conception, save as against a bona fide inventor who in the meantime may have given the invention to the public. By his careful concealment of the invention for more than two years after making it, Bruñe would have lost his right to a subsequent inventor who might have given it to the public during the period of concealment. Bor the-same, if not a stronger reason, he should lose it to one who first conceived it, and, resuming diligence, gave it to the public-during the same period. A decision of the court of appeals of the seventh circuit, strongly relied on in behalf of Brune’s contention, appears to us to directly support the position of Dieckmann. International Teleph. Mfg. Co. v. Kellogg Switch Board & Supply Co. 96 C. C. A. 395, 171 Fed. 651-656. The suit was for an infringement of a patent to one Dean. Several questions were raised on behalf of the infringer, including the one-herein discussed.
. Dean conceived the invention in 1895, and made a device, which he did not give to the public until he filed his application-in March, 1901, upon which the patent issued in November. McCormick conceived the invention in September, 1900, and’ made a transmitter in the same month, which embodied the invention. But he did not put it upon the market until after-Dean had applied for a patent and placed his transmitter upon the market. The court held that Dean was entitled to his patent. It was said by Judge Baker, who delivered the opinion of an unanimous court: “If, during Dean’s suspension of activities, McCormick had either patented the device, or brought it into public use without a patent, the public would have been indebted to McCormick for benefits conferred, and Dean might well be held estopped by his delay from claiming the public- *410 grant; but in our judgment neither reason nor authority sanctions an estoppel against the first and true inventor, unless the later comer has cut in between, and made the public his debtor by being the first to get to the Patent Office or the market.”
In Burson v. Vogel, 29 App. D. C. 388, it did not appear that the first to conceive “suppressed or intended to conceal knowledge of his invention after its reduction to practice.” It is therefore not an authority in support of the decision of the Commissioner, notwithstanding some general expressions that may seem to conflict, to some extent, with the decision now made in regard to the use of the machine of Bruñe in the factory. The facts of the two cases on this point are quite different.
Believing that there was error in the decision awarding priority to Bruñe, it will be reversed. It is so ordered, and that this decision be certified to the Commissioner of Patents, as the law requires. Reversed.
A petition for a rehearing was denied October 5, 1911.